**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SUSAN MELLEN; JULIE CARROLL; JESSICA CURCIO; DONALD BESCH, *Plaintiffs-Appellants*, v. MARCELLA WINN, *Defendant-Appellee.* | No. 17-55116 D.C. No. 2:15-cv-03006-GW-AJW OPINION |

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted May 18, 2018
Pasadena, California

Filed August 17, 2018

Before:  Kim McLane Wardlaw, Jacqueline H. Nguyen,
and John B. Owens, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### Civil Rights / Qualified Immunity

The panel reversed the district court's summary judgment in favor of Detective Marcella Winn on qualified immunity grounds in a 42 U.S.C. § 1983 action.

Plaintiff Susan Mellen was wrongly imprisoned for seventeen years before securing habeas relief in October 2014, and she and her children brought this civil rights action against Detective Winn based on her failure to disclose evidence.

The panel held that the record demonstrated as a matter of law that Detective Winn withheld material impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), and raised a genuine issue of material fact as to whether Detective Winn acted with deliberate indifference or reckless disregard for plaintiff's due process rights.

The panel held that the law at the time of 1997–98 investigation clearly established that police officers investigating a criminal case were required to disclose material, impeachment evidence to the defense.

The panel concluded that the district court abused its discretion by striking the declaration of Mellen's police practices expert, Roger Clark.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel reversed summary judgment on qualified immunity grounds and the order striking Clark's declaration, and remanded to the district court for further proceedings.

## COUNSEL

Anna Benvenutti Hoffmann (argued), Rick Sawyer, and Nick Brustin, Neufeld Scheck & Brustin LLP, New York, New York; Deirdre Lynn O'Connor, Seamus Law APC, Torrance, California; for Plaintiffs-Appellants.

Calvin House (argued), Gutierrez Preciado & House LLP, Pasadena, California; Laura E. Inlow, Collinson Law, Torrance, California; for Defendant-Appellee.

## OPINION

WARDLAW, Circuit Judge:

Susan Mellen was wrongly imprisoned for seventeen years before securing habeas relief in October 2014. After release from prison, Mellen and her three children, Julie Carroll, Jessica Curcio, and Donald Besch, brought suit under 42 U.S.C. § 1983 against Detective Marcella Winn,[1] arguing that Detective Winn failed to disclose evidence that would have cast serious doubt on the testimony of June Patti,

---

[1] Mellen's complaint also named the City of Los Angeles and Richard Hoffman, Detective Winn's supervisor, as defendants. Mellen voluntarily dismissed Hoffman from this case on March 23, 2016, and she voluntarily dismissed the City and her claims under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), on April 1, 2016.

the star prosecution witness in Mellen's trial.  Detective Winn asserted qualified immunity, arguing there was no genuine dispute of material fact as to whether the withheld evidence was material or as to whether Detective Winn acted with deliberate indifference or reckless disregard for Mellen's due process rights, and that the law at the time of the investigation did not clearly establish that police officers were required to disclose material, impeachment evidence. The district court granted summary judgment in Detective Winn's favor.

We conclude, first, that the record demonstrates as a matter of law that Detective Winn withheld material impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972) (extending *Brady* to impeachment evidence), and raises a genuine issue of material fact as to whether Detective Winn acted with deliberate indifference or reckless disregard for Mellen's due process rights.  Second, we conclude that the law at the time of the 1997–98 investigation clearly established that police officers investigating a criminal case were required to disclose material, impeachment evidence to the defense.  Finally, we conclude that the district court abused its discretion by striking the declaration of Mellen's police practices expert, Roger Clark.  We reverse the grant of summary judgment on qualified immunity grounds and the order striking Clark's declaration, and remand to the district court for further proceedings consistent with this opinion.

## I.

Susan Mellen was convicted of first-degree murder in June 1998, based largely on the testimony of June Patti (Patti).  Mellen contends that Detective Winn wrongfully withheld a statement that June Patti's sister, Laura Patti

(Laura), made to Detective Winn before trial.  Laura, who was a Torrance police officer at the time of the investigation, told Detective Winn that her sister, June Patti, was "the biggest liar" that she had "ever met" in her life and that she did not "believe anything [Patti] says."

Laura said that she based this conclusion on her personal experiences with her sister, who, since the age of four or five, "had a habit of not telling the truth." Laura also explained that her sister had filed more than twenty complaints against Laura with the Torrance Police Department, all unsubstantiated, and that Patti "constant[ly]" lied to Laura's colleagues.  At her deposition, Laura also said that she believed that Patti had been a "certified informant" with the Torrance Police Department in the early 1990s.

Laura stated that her conversation with Detective Winn was brief, and Detective Winn did not inquire into why Laura believed her sister was a liar.  But it turned out that Laura was right about her sister.  Patti was deemed an "unreliable informant" by the Torrance Police Department five years before Mellen's trial.  And in a fourteen-year span between 1988 and 2002, Patti had more than 800 contacts with law enforcement, where she was known to exaggerate or outright lie to police officers to protect or advance her own interests.

Although the revelations about Patti proved the loose thread that unraveled Mellen's wrongful conviction, Detective Winn contends that no reasonable officer would have understood that *Brady*/*Giglio* required the disclosure of Laura's statements.[2]   Because the Supreme Court has

_____

[2] Detective Winn now also disputes that she ever spoke with Laura Patti about her sister.  She argues, in the alternative, that if the statements

instructed that *Brady*/*Giglio* requires a "fact-intensive"
inquiry into whether "there is a reasonable probability that,
had the evidence been disclosed, the result of the proceeding
would have been different," *Turner v. United States*, 137 S.
Ct. 1885, 1888, 1893 (2017) (citations omitted), we turn to a
close examination of the investigation and the trial that
resulted in Mellen's wrongful conviction.

### A. The Investigation

Rick Daly's body was found burned near a dumpster in
San Pedro, California, on July 21, 1997. After two weeks
while police officers struggled to identify the body, calls
flooded into the Los Angeles Police Department's (LAPD)
South Bureau Homicide Unit, and filtered to Detective
Winn, who had taken responsibility for the case. The first
tips would later prove the most accurate: a caller told
detectives that Daly was killed by three members of
"Lawndale 13," a gang that congregated around the "Mellen
Patch," a duplex in Torrance, California, owned by members
of the Mellen family and frequented by methamphetamine
users. Detectives also heard that Daly was killed in the back
house of the Mellen Patch, where Susan Mellen had lived
before February 1997,[3] and that Daly's body was transported
in Scott "Skip" Kimball's car to San Pedro where the three
men set Daly on fire.

On August 12, 1997, Detective Winn prepared a search
warrant for the Mellen Patch and arrest warrants for Lester

---

were made, she would have communicated them to the prosecutor,
undermining her argument that no reasonable officer would have known
she was required to do so.

[3] Mellen moved out of her family home at the Mellen Patch to live
with her boyfriend, Thomas Schenkelberg, and her two children.

"Wicked" Monllor, Chad "Ghost" Landrum, and Santo
"Payaso" Alvarez, the three men identified in the caller's tip
and corroborating reports.  The LAPD executed the search
warrant at the Mellen Patch early in the morning the next
day.  The warrant yielded several potential witnesses and
residents of the Mellen Patch, including Monllor's mother
and sister, Mellen's sister-in-law, niece, and nephew, and
two other people from the neighborhood.  Detective Winn
later learned that Monllor, Landrum, and Alvarez were in
custody on unrelated charges.  Detective Winn had also
earlier spoken with Scott Kimball, who was also in jail on
unrelated charges, and who told Detective Winn that he had
lent his car to his friends on the night of the murder.

The evening after the LAPD executed the search warrant
at the Mellen Patch, June Patti contacted Detective Winn for
the first time, leaving a voicemail message that indicated that
Patti had information about the Daly murder.  The next
morning, Patti appeared at Monllor's arraignment, along
with Monllor's mother.  And two days after Monllor's
arraignment, Patti directed Detective Winn's attention to
Susan Mellen, Daly's ex-girlfriend, and a long-time Mellen
Patch resident.[4]

Patti gave her first oral statement to Detective Winn on
August 15, 1997.  At the time, she told Detective Winn that,
on the same night that the LAPD executed the arrest warrant
at the Mellen Patch, Patti called Mellen and Mellen's

---

[4] Detective Winn interviewed a second witness, Cynthia Sanchez,
who also implicated Mellen, but Sanchez told Detective Winn that she
had learned what she knew from June Patti.  Sanchez also stated that
Monllor's mother had asked about whether bleach would "remove blood
from linoleum," and had cleaned the back of the house—leads that
officers did not follow.

boyfriend, Tom Schenkelberg (Tom), to buy "speed." Because Patti was purportedly a paralegal at the courthouse (she was not), and came from a family of police officers, Mellen asked to meet Patti at the motel where Patti was staying to talk about the Daly murder.

It was at the Travelodge motel that Mellen allegedly confessed her involvement in Daly's murder to Patti. Patti said that Mellen told her that she and Tom, with help from Chad Landrum, killed Daly because Daly "kept going in [Mellen's mother's house] and stealing all her things, their speed, their pips [sic]." Patti said that Mellen had told her that Tom and Landrum kicked Daly and taped his mouth shut, that Landrum pulled out a knife and threatened to stab Daly, and that Tom and Landrum set fire to Daly in Mellen's mother's house.[5] Mellen allegedly told Patti that she pulled back Daly's head with his bandana, kicked Daly, and got high while Tom and Landrum beat Daly. Patti also said that a fourth, unnamed person came over from next door to tell Mellen, Tom, and Landrum to be quiet, and that this person was already in custody.[6] Patti said that Mellen and Landrum put Daly in the back of Mellen's car and "dropped him off" in San Pedro because "Tom didn't want to go."

---

[5] Patti also told Detective Winn that Tom and Landrum set fire to the back house of the Mellen Patch that night. In fact, however, the back house was not burned until ten days after police discovered Daly's body.

[6] Patti ended her oral statement to Detective Winn by stating that she had previously helped a Lomita detective named "Marshall" arrest someone named "Trigger" for murder. Neither this statement nor Patti's role as a paid informant was investigated.

At the end of the August 15, 1997 recorded oral statement,[7] Detective Winn prepared a written statement for Patti's signature. The written statement adds more detail to Patti's oral statement, detail that Detective Winn was aware of from the police investigation thus far. Notably, the written statement mentioned that the fourth, unnamed person acted as a lookout for Mellen, Tom, and Landrum. Patti's written statement also added that Landrum set Daly on fire again in San Pedro, and that Patti and Tom had left Daly's body near a trash can in an alley with a chain link fence because "only Mexicans live there and they won[']t say anything"—details that did not come from Patti's oral statement. The written statement also added that Mellen and Landrum dumped the body in San Pedro around "8:30 or 9:00 P.M.," when Patti previously told Detective Winn only that Landrum and Tom started beating Daly "during the daytime."

Relying on Patti's written statement, Detective Winn presented the case against Mellen to district attorney Steven Schreiner, who, in turn, filed one count of first-degree murder against Mellen.[8] Mellen was arrested on August 25, 1997, and in an interview with Detective Winn, insisted that she had nothing to do with Daly's murder. Mellen told Detective Winn that she and Cory Valdez, Daly's then-girlfriend, had learned from a woman named Ginger

---

[7] The transcript of Patti's oral statement is undated. It is therefore unclear whether Patti's defense counsel had the benefit of the transcript at Patti's criminal trial or whether Patti's habeas counsel transcribed the oral statement as part of the habeas proceedings.

[8] The district attorney's office filed separate murder charges against Landrum and Monllor, but never filed charges against Tom or Alvarez. In fact, Alvarez told Innocence Matters investigators that he was never even questioned about the Daly murder.

Wilborn that Landrum, Monllor, and Alvarez had murdered
Daly, and had wrapped his body in a blanket to transport him
to San Pedro.  Mellen also told Detective Winn that she had
returned to the Mellen Patch with her children on the evening
of the murder, but that she had stayed in the area for only ten
to fifteen minutes.  Mellen said that while she was there, she
saw Daly alive, and he must have been murdered after she
left.  Detective Winn told Mellen that she did not believe her.

The preliminary hearing in Mellen's criminal case,
where she was charged alongside co-defendants Monllor and
Landrum, took place on November 13, 1997. Mellen was
represented by Lewis Notrica, a private family law attorney
whom Mellen had previously asked to handle her divorce.
The government was represented by Valerie Rose, a deputy
district attorney who had prosecuted cases since 1991.

Patti testified at the preliminary hearing.  She again said
that Mellen had confessed her involvement in Daly's murder
to Patti at the Travelodge motel, reiterating that Mellen and
Tom recruited Landrum from next door to beat up Daly for
stealing Mellen's things.  This time, however, when defense
counsel questioned Patti about the involvement of a fourth
person, Patti insisted that the fourth person had only banged
on the window and said "shut the fuck up," but otherwise
had nothing to do with the murder.  When defense counsel
pressed Patti about the inconsistencies between her written
statement and her preliminary hearing testimony as to this
fourth person, Patti said that Detective Winn made up the
details of the story.  Patti testified that she told Detective
Winn that she was "not signing" the written statement
because Detective Winn "wrote something to the [effect]
that the person in jail was a lookout" when that was not true.
Patti also testified that Detective Winn told her that "the
person was in jail and she wanted him to be blamed for it,

and he didn't do it, and he wasn't around when it happened."
Patti said that Detective Winn was "pissed off" when Patti
told her "four or five times" that the written statement did
not reflect what Mellen had said, but Patti ultimately signed
it because she was pressed to get to the airport.

This is the most notable inconsistency between Patti's
earlier oral and written statements and her preliminary
hearing testimony, but there are others.   In her oral
statement, Patti said that she called Mellen to buy speed, and
that the "motel receipt" would show the phone number to
which the call had been placed.  Patti initially testified that
she had "dial privileges" from her room, but when pressed
by Mellen's counsel about how she paid for the phone call,
Patti changed her story: "Actually," she testified, "we didn't
call from the room.  We called from downstairs at the pay
phone, because it was a pager, and my dad paid for the calls
and I didn't want him to find out I was paging people for
speed."   And for the first time at the preliminary hearing,
Patti testified that she was on speed the night that she talked
to Mellen at the hotel.  Patti's preliminary hearing testimony
did not mention whether anyone else had been present with
her at the hotel, whether Daly's attackers had used a hammer
or a knife, or any other detail about how they had allegedly
kept Daly quiet or transported his body to San Pedro.

B.  Pre-Trial Matters

As Mellen's case approached trial in May 1998, several
events, in addition to the alleged telephone call between
Laura Patti and Detective Winn, shed further light on Patti's
unreliability as the star government witness.

In a letter dated February 25, 1998, Patti wrote to District
Attorney Rose explaining that she could not return to
California to testify at Mellen's murder trial because Patti's

sister, Laura, had threatened to arrest her.  Patti sent the letter to the prosecutor while living with her boyfriend in Washington State.  In the letter, Patti said that she was writing to notify District Attorney Rose that she had outstanding warrants for traffic tickets and for an incident where she used her "sister Serina Patti [sic] name after [she] hit a women's car in a [sic] accident."  Patti said that her sister, Laura, a Torrance police officer, had warned Patti that if she returned to California she would be arrested on those warrants.  Patti also recounted numerous incidents where she had lied to police to evade arrest warrants, had impersonated her sister, Serina Patti, and had otherwise interacted with law enforcement.  She asked the district attorney to "contact the Torrance D.A." to get the ticket "dismissed in the interest of justice."

The district court found that Patti's February 1998 letter was placed in the "murder book," a dossier that was supposed to contain all of the investigatory information about the Daly murder and which was turned over to defense counsel on October 1, 1997.  But the record demonstrates that the district attorney's office received Patti's letter after the murder book had already been turned over to the defense, and it is not clear from the record that defense counsel had access to the letter.  District Attorney Rose's own declaration suggests that she would not have turned over the letter because she was "unaware of any legal authority which provided that sibling rivalry . . . was *Brady* evidence."

Rose replied to Patti's letter on April 16, 1998, two and a half weeks before Mellen's criminal trial would start on May 4, 1998, in a letter intended "to memorialize [a] telephone conversation regarding [Patti's February 1998] letter."  It advised "[n]either your sister nor any other officer can serve you or arrest you for anything that happened in this

state prior to the date that you came into . . . the state in order
to comply with the subpoena."  The letter then concluded, "I
will send a copy of this letter to your sister, as well as to the
defense attorneys on the criminal case of *People v. Monllor,
Mellen & Landrum*."

Patti's credibility was also at issue in a hearing on the
morning before trial, where the parties argued pending
motions in limine.  District Attorney Rose asserted that it
would be inappropriate "to ask about [Patti's] arrests and a
misdemeanor."    Patti had two prior misdemeanor
convictions for forgery and for harassment of her sister
Laura, and Patti had numerous prior arrests for drug-related
charges.    The trial court opined that Patti's prior
"misdemeanor conviction[s]" and arrests were "not
admissible," and Notrica, Mellen's defense counsel, replied
"I [have] no quarrel with that."

Rose then discussed Patti's testimony that she had
stabbed Mellen's prior boyfriend because he had grabbed her
breast, and an allegation that Patti had stolen Mellen's
brother's vehicle because Mellen's brother killed one of
Patti's dogs.  As to the first incident, Notrica replied, "I don't
even know where I got the information."   When the trial
court asked whether Notrica intended to use the information
at trial, he said "no."  As to the second incident, Notrica said,
"I don't have [Mellen's brother] under subpoena," so
"[testimony about] it is not going to happen."

The parties also discussed whether Patti was a paid
informant.  Notrica had suggested to the district attorney that
Patti might be a paid informant because she "appears to have
a lot of arrests, but no convictions."   In reply, district
attorney Rose said that she had "no knowledge of such," and
she argued that raising Patti's potential role as a paid
informant would be "inappropriate" at trial.  At the time,

Patti had, in fact, enrolled as a paid informant with the El
Segundo and Redondo Beach police departments, and the
Torrance Police Department deemed Patti an "unreliable
informant" in 1993 for providing exaggerated and untruthful
information to law-enforcement officers.    The court,
however, agreed with the prosecutor, concluding that
"absent some good faith basis," it would not be
"appropriate" for the defense to ask whether Patti had
worked as a paid informant.  The case then proceeded to trial.

### C.  The Trial

Opening statements began on May 4, 1998.  There, the
prosecution offered its theory of the case, which relied
entirely on June Patti's preliminary hearing testimony.  The
prosecution suggested that, on the night of Daly's murder,
Mellen instructed Tom and Landrum to kill Daly, who had
previously dated Mellen, because Daly had stolen from
Mellen's mother's house.  The district attorney stated that
Mellen and Tom had returned to Mellen's mother's
abandoned house on the night of the murder and found Daly
sleeping there.  This allegedly made Tom angry and led him
to convince a neighbor, Landrum, to help beat up Daly in
exchange for a "quarter ounce of speed."   The district
attorney told the jury that Mellen gagged and kicked Daly,
and, after he was set on fire, drove his body to San Pedro and
dumped it in an alley.

Patti took the witness stand on May 6, 1998.  At trial,
Patti changed her testimony significantly from her
preliminary hearing testimony, offering an entirely new
motive for Daly's murder and details that she had never
before offered to anyone.  Patti testified that, on that night at
the Travelodge motel, Mellen confessed that she had been
giving oral sex to Daly when Tom "kind of caught her with
her pants down."  Patti testified that Daly and Mellen had a

child together and that Mellen "loved" Daly even though Daly had been stealing from Mellen, and Mellen had started a new relationship with Tom. She testified that Tom became angry when he figured out what had happened, and started beating Daly on the head with a hammer that Tom had taken from Daly's bicycle.

Patti then testified that "somebody from next-door" (Landrum) came over to help Tom beat up Daly. Tom allegedly convinced Landrum to help him beat up Daly and Mellen in exchange for "a quarter ounce of dope." Patti testified that Tom left, and Landrum continued to beat up Daly. When Tom returned, Mellen gagged Daly with his own bandana by stuffing it down his throat and supergluing and taping his mouth shut. Patti said that, after hearing Mellen's confession, she avowed to tell her sister, who was a Torrance police officer.

At the end of Patti's direct examination and, evidently recognizing that Patti's testimony contradicted much of her prior testimony—and the prosecution's opening statement—Rose prompted Patti to admit that she had not told the whole truth at the preliminary hearing. Patti said that she lied at the preliminary hearing because, she said, "I don't want Susie [Mellen] to go to jail." Patti also admitted that she had never previously told anyone that Mellen had given Daly oral sex on the night of the murder:

> Q. Did you indicate anything about the motivation behind the killing, Tom walking in on this sexual act?
>
> A. Did I tell anybody about that before? Absolutely not. It was something she told me in private.

The prosecutor later returned to this topic:

> Q. Why, today, are you telling us this
> additional information regarding motive,
> regarding the additional activity?
>
> A. Because since I have been here for the last
> two days, I heard that Susan [Mellen] has
> had people come and try to lie against my
> character; and one of her brothers, which
> I don't know, said he killed a dog of mine.
>
> That is the law.  If she is going to lie
> against me, I am going to tell the truth of
> what she said.

The prosecutor also asked Patti about the super glue, another
fact that Patti had never previously disclosed:

> Q. You had indicated — was there any
> changes in your testimony regarding the
> movement of the body or the movement
> of Rick [Daly] to San Pedro?
>
> A. No.
>
> Q. Now, you had indicated something about
> the super glue on the mouth.
>
> A. Yes.
>
> Q. Was she — did she do that or did
> [Landrum] do that, or did they both do it
> together?

A.  She did that.

After this questioning, Mellen's counsel cross-examined
Patti.   Notrica pointed out that Patti's testimony was
inconsistent with her testimony at the preliminary hearing:

> Q.  You have gone out of your way to
>     embellish your testimony, haven't you?
>
> A.  No, I have not.
>
> Q.  Well, you were under oath when you
>     testified in November of 1997, weren't
>     you?
>
> A.  I told the truth.   I just didn't tell the
>     complete truth.
>
> Q.  You hid some facts from Ms. Mellen, as
>     well as her counsel.
>
> A.  No, I hid the facts from the police that
>     Ms. Mellen had told me because I didn't
>     want to crucify her.
>
> . . .
>
> Q.  Ms. Patti, you said that Susan [Mellen]
>     and Rick [Daly] were engaged in a sex act
>     in their house when Tom walked in.
>
> A.  That is what she told me.
>
> Q.  You never testified to that before, though.

> A. I didn't want people to know she was a
> cock-sucker.  No, I did not.  It was a
> private conversation between her and I.

Notrica also pointed out that Patti had not told the police the
fact about the "super glue."  On cross-examination, the
defense asked:

> Q. Are we getting the whole truth today?

> A. Probably not because I don't want to
> crucify her.  I told you what you need to
> know.

The day after cross-examination, the prosecution re-
opened Patti's direct examination.  Patti then testified that
she saw Mellen driving Kimball's green BMW away from
the Travelodge motel on August 13, 1997.  She further
testified that Mellen had told her that she used Kimball's car
to drive Daly's body to San Pedro.  When the prosecutor
asked Patti why she had not offered this testimony the day
before during her first direct examination, Patti said, "I
wasn't asked."  During her second cross-examination, Patti
admitted that she had "never discussed" Mellen driving
Kimball's car "with anybody until yesterday."

Detective Winn took the stand days after Patti's
testimony.  Detective Winn admitted that Patti had not
mentioned the "sexual contact" between Mellen and Daly
until the other day in court.

The only other rebuttal of Patti came from Mellen
herself.  Mellen testified that Patti was "a lier [sic]," "a
snitch," "a thief," and "something I would never want to call
my friend."  Mellen testified that Patti had called her at
2 A.M. one morning at the beginning of August, but that

Mellen had told her "don't call back here" and had hung up
without finding out why Patti had called.  Mellen also stated
that she never went to the Travelodge motel to meet Patti.

At closing argument, defense counsel argued that Patti
was a liar and framed the trial as a contest between the
credibility of June Patti and Susan Mellen.  He said:

> But what she said was full of misstatements,
> and she said them under oath.  And she was
> quick to tell this court, this jury, that: when I
> testified the first time, I didn't tell the whole
> truth.
>
> Why didn't she tell the whole truth?  Well, I
> was trying — I felt sorry for Susan.  Well,
> what she said was enough to, quote, hang her
> anyway.  So she came back the second time
> and the next day which is the third time and
> embellished her statement.
>
> Now, she is telling the whole truth.  She had
> to get everything out.  Why couldn't she get
> everything out the first time when we had a
> chance to cross-examine her.  I can't answer
> that question.  I'm just saying I believe she
> lied for whatever reason and she lied so well
> that Ms. Mellen was arrested for homicide.
>
> . . .
>
> So the issues are simple.  I submit,
> respectfully, that it's between June Patti and
> Susan Mellen.

The jury returned a guilty verdict, and the judge sentenced Mellen to life imprisonment without the possibility of parole on June 5, 1998. Speaking at her sentencing hearing, Mellen said, "I don't understand why I'm being put in the fire, why this woman lied and told the things that she said that are so evil. I'm totally innocent. . . . With God's hands upon me now, I'm innocent."

### D. Habeas Proceedings

Nearly two decades later, Mellen's case came to the attention of Innocence Matters, a non-profit legal organization whose mission is to secure habeas relief for people with valid innocence claims. As part of its investigation, Innocence Matters spoke with Laura Patti, who told them that she had spoken with Detective Winn in advance of Mellen's trial and had then shared her belief that her sister was not to be trusted. Laura also admitted that she had never been present for one of her sister's lies to law enforcement, and had no personal information about whether her sister lied as part of the Daly murder investigation. And she offered her own belief that Detective Winn reasonably relied on June Patti's statements because, she remembered, Detective Winn had told her that her sister offered details about the murder that were not publicly available. After Innocence Matters contacted her, Laura called Detective Winn to let her know that she had been contacted as part of Mellen's habeas proceedings.

In addition to speaking with Laura Patti, Innocence Matters contacted numerous others close to the investigation, including Chad Landrum and Santo Alvarez, who confessed to the murder and said that Mellen had nothing to do with it. Armed with this information and testimony from other witnesses, Innocence Matters filed a

habeas petition on Mellen's behalf, which the state court granted in October 2014.

## II.

We now review this evidence to determine whether Detective Winn violated *Brady*/*Giglio* by failing to disclose Laura's statements that her sister, June Patti, was "the biggest liar" that she had "ever met," and that she did not "believe anything [Patti] says."

### A. *Brady*/*Giglio* Violation

The elements of a civil *Brady*/*Giglio* claim against a police officer are: (1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense, (2) the suppression harmed the accused, and (3) the officer "acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. City & Cty. of San Francisco*, 570 F.3d 1078, 1087, 1089 (9th Cir. 2009). Although Detective Winn now disputes that she spoke with Laura Patti before Mellen's trial, she concedes that, if the conversation took place, Laura's statements were favorable to Mellen, and were never shared with the prosecutor or the defense. The only questions the parties debate are whether Laura's statements were material and whether Detective Winn was deliberately indifferent not to disclose them. *See Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006) (per curiam) ("*Brady* suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." (citation and quotation marks omitted)); *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule.").

### 1. Materiality

We conclude that Laura's statement was material *Brady* evidence as a matter of law.  Suppressed evidence is material if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  We have recognized that "[i]mpeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005) (collecting cases).  Indeed, we have concluded that "[t]he recurrent theme . . . is that where the prosecution fails to disclose evidence . . . that would be valuable in impeaching a witness whose testimony is central to the prosecution's case, it violates the due process rights of the accused and undermines confidence in the outcome of the trial." *Horton v. Mayle*, 408 F.3d 570, 581 (9th Cir. 2005).

No one disputes here that June Patti's testimony was crucial to the district attorney's prosecution of Mellen for murder.  Although the government offered ten witnesses in its case-in-chief,[9] the prosecutor recognized even at the time that "the bulk of the evidence" in the government's case

---

[9] The witnesses were (1) Jeremy Duncan, (2) June Patti, (3) Ogbonna Chinwaah, (4) Robert Marti, (5) Kenneth Whitehead, (6) Erin Riley, (7) Robert Monson, (8) Felicia Mena, (9) Talbot Terrell, and (10) Marcella Winn.  Chinwaah was a deputy medical examiner in the county coroner's office; Riley and Monson were criminalists with the LAPD's serology unit; Duncan, Marti, Whitehead, Terrell, and Winn were homicide detectives and police officers; and Mena testified that on the night of the murder she observed Landrum, accompanied by unknown individuals, drive away from the Mellen Patch in Scott Kimball's BMW, carrying a heavy load in the trunk, and return about an hour later, without the heavy load, accompanied by one other man.

would come from "a conversation between [Mellen] and a People's witness by the name of June Patti." The district attorney's word about the "likely damage" of the suppressed evidence is particularly strong evidence that the testimony was material. *Kyles*, 514 U.S. at 444; *see Silva*, 416 F.3d at 990 ("The prosecutor's actions can speak as loud as his words."). And the prosecutor's assessment has been confirmed many times over. In habeas proceedings, the state court observed that Patti's testimony was "the only evidence of Ms. Mellen's involvement in this crime." And at oral argument in this appeal, Detective Winn conceded that, without Patti's trial testimony, there "would not have been a conviction." Oral Argument at 13:00 ("We're not disputing the fact that her testimony is probably responsible for the conviction.").

The issue of Patti's credibility is made all the more important because Patti testified to what amounted to a confession, to which she claimed to be the only witness. As the Supreme Court has noted, "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139 (1968) (White, J., dissenting)). Patti provided the only "direct" evidence that connected Mellen to the crime. No fingerprints, DNA evidence, or eyewitness testimony placed Mellen at the scene. And because Patti and Mellen were the only people in the room at the time of the alleged confession, the trial turned, as Mellen's defense counsel put it at closing argument, on a decision between Patti's word and Mellen's.

Detective Winn nonetheless contends that Laura's statements were not material because Mellen's defense

counsel had access to other more probative evidence of Patti's credibility. But we have rejected this argument before. "[T]he government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative. Rather, the government is obligated to disclose *all* material information casting a shadow on a government witness's credibility." *Carriger v. Stewart*, 132 F.3d 463, 481–82 (9th Cir. 1997) (en banc) (citation and internal quotation marks omitted) (emphasis in original). "[A] defendant's conviction in spite of his attempt at impeaching a key government witness demonstrates only the inadequacy of the impeachment material *actually presented*, not that of the suppressed impeachment material; in light of the failure of the impeachment attempt at trial, the suppressed impeachment material may 'take[] on an even greater importance.'" *Silva*, 416 F.3d at 989 (quoting *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002)) (alteration in *Silva*).

The undisclosed statements were not cumulative of the other impeachment evidence presented at trial; they were of a different kind. *See United States v. Collicott*, 92 F.3d 973, 980 n.5 (9th Cir. 1996) (listing five types of impeachment evidence); *see also Gonzalez v. Wong*, 667 F.3d 965, 984 (9th Cir. 2011) ("Where the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material."). The possibility for the defense to use statements from Laura—an immediate family member, a police officer, and a source unaffiliated with the drug culture of which both Mellen and Patti were a part—"would have provided the defense with a new and different ground of impeachment." *Benn*, 283 F.3d at 1056.

At trial, the best impeachment evidence that the defense could offer were Patti's own statements that she had lied to law-enforcement officers in the past, but even those statements did not have the same probative value as the possibility of hearing from a law-enforcement officer and Patti's immediate family member, who grew up with Patti and could testify to a lifetime, and a lifestyle, of habitual lies. The prosecution's reopening of direct testimony gave Patti the chance to explain away, with success, the inconsistencies in her prior testimony as attempts to protect Mellen's reputation.  And doing so, Patti may have even bolstered her own credibility further by also demonstrating a willingness to admit mistakes.  *See* 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 6:102 (4th ed. 2018) (explaining how witnesses may repair credibility by explaining prior inconsistent statements).   As we have recognized before, "[i]t is one thing for a witness to admit that he could lie; everyone can lie"; it is a different thing altogether when hard evidence, which cannot so easily be explained away, provides proof of past lies, deception, and manipulation.  *Gonzalez*, 667 F.3d at 985.

Nor would Laura's statements have been duplicative of evidence that the defense possessed about Patti's prior misdemeanor convictions, prior drug use, or rumors that Patti had stolen Mellen's brother's car or stabbed Mellen's ex-boyfriend, all of which the prosecution discussed with defense counsel on the morning of the first day of trial.  The defense could not impeach Mellen with her prior misdemeanor convictions because the state trial court determined that the convictions were not admissible impeachment evidence under the California Evidence

Code.[10]  And we have recognized that evidence of prior drug use is not probative of a witness's credibility, absent other evidence linking the drug use to a "motivation, bias, or interest in testifying" or indicating that the witness was "intoxicated while testifying."  *United States v. Kizer*, 569 F.2d 504, 505–06 (9th Cir. 1978).  Nor were the rumors about Patti's interactions with Mellen's close associates probative of Patti's truthfulness—they reflected Patti's lack of respect for persons and property, but not Patti's reputation for lying.  At best, the defense could have used Patti's feud with the Mellens to suggest a motive for Patti to lie against Mellen, but even that evidence would have been of minimal probative value, given that Patti's fights were limited to incidents involving Mellen's brother and ex-boyfriend, not Mellen herself.  At worst too, the prosecution could have used the rumors to further link Patti and Mellen to each other, and to a drug culture that impugned both women.

Although Mellen later learned through her own investigation that Patti had been a paid informant for the El Segundo, Redondo Beach, and Torrance police departments, the prosecutor disclaimed any knowledge of Patti's role as a paid informant on the first morning of trial, so this evidence was never introduced.  We think it likely that the government violated *Brady* a second time by failing to obtain and review Patti's status as an informant with other local law-enforcement agencies prior to trial, particularly when Patti was undisputedly the prosecution's star witness; Patti had

---

[10]  The "Truth in Evidence" amendment to the California Constitution, Cal. Const., art. I, § 28, subd. (d), abrogated the felony-convictions-only rule in criminal cases and gave criminal courts "broad discretion to admit or exclude acts of dishonesty or moral turpitude relevant to impeachment."  *See People v. Wheeler*, 841 P.2d 938, 939 (Cal. 1992).  Defense counsel, however, failed to protest on this ground.

previously disclosed to Detective Winn that she had helped
another detective with a different homicide investigation;
and defense counsel specifically questioned whether Patti
was a paid informant. *See Carriger*, 132 F.3d at 479–80
("Because the prosecution is in the unique position to obtain
information known to other agents of the government, it may
not be excused from disclosing what it does not know but
could have learned.").  At a minimum, however, that Patti
was a paid informant does not undermine the materiality of
Laura's statements to Detective Winn, which the
government also did not make available for Mellen's
defense.

The only extrinsic evidence attacking Patti's character
for truthfulness at trial was Mellen's own testimony that
Patti was a liar.  But, as the prosecution pointed out at trial,
Mellen's obvious interest in the outcome of her case severely
undercut the force of her testimony.  *See Tennison*, 570 F.3d
at 1091 ("[T]he availability of particular statements through
the defendant himself does not negate the government's duty
to disclose." (citation omitted)); *see also Bailey v. Rae*,
339 F.3d 1107, 1116 (9th Cir. 2003) ("Independent
corroboration of the defense's theory of the case by a neutral
and disinterested witness is not cumulative of testimony by
interested witnesses." (quoting *Boss v. Pierce*, 263 F.3d 734,
735 (7th Cir. 2001)).

Had the defense known to call Laura as a witness,
Laura's trial testimony could have highlighted the evidence
that demonstrated that Patti was not testifying truthfully.
Had Laura testified to Patti's reputation as a liar, the jury
would have had an opportunity to evaluate Patti's prior
inconsistent statements in a different light, and likely would
have given those prior inconsistent statements more weight,
particularly given Laura's profession and Laura and Patti's

shared family history.  Moreover, as illustrated by Mellen's
habeas proceedings, Laura was the gateway to a whole host
of other information about Patti's unreliability as a paid
informant and her many, untruthful contacts with law
enforcement.  Mellen argued to the district court that, had
the defense had the opportunity to question Laura, it might
have unraveled earlier that Patti had been an unreliable
informant for the Torrance police department, and the
defense could have called a number of other witnesses,
including Torrance police officers, who would have testified
to Patti's reputation as a liar.  The district court dismissed
Mellen's arguments, suggesting that they amounted to no
more than a "nursery rhyme" that schoolchildren use to teach
themselves that "a kingdom might be lost 'all for the want of
a horseshoe nail.'"  We do not find Mellen's arguments so
fanciful, and conclude that the district court was wrong to
dismiss them.

Detective Winn further contends that because Mellen's
defense counsel knew that Patti had a sister who was a
Torrance police officer and had access to much of the other
evidence that could have been used to impeach Patti, this
case is analogous to *Raley v. Ylst*, 470 F.3d 792, 804 (9th
Cir. 2006), *Rhoades v. Henry*, 598 F.3d 495, 502 (9th Cir.
2010), and *Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th
Cir. 2013), where we concluded that a *Brady/Giglio*
violation could not lie where the accused is aware of the
essential facts to be established by the evidence.  But *Raley*,
*Rhoades*, and *Cunningham* are readily distinguishable.  In
*Raley*, the evidence suppressed was the defendant's own
medical records, 470 F.3d at 803–04; in *Rhoades*, the
evidence was the defendant's own statement that he invoked
his right to remain silent, 598 F.3d at 502; and, in
*Cunningham*, the evidence was the victim's medical records
and autopsy report, 704 F.3d at 1154.

In each of those cases, we noted that the defendant was aware of the "existence of the records he claims were withheld," *id.* (quoting *Raley*, 470 F.3d at 804), because the defendant either participated personally in the creation of records or the records were disputed in the case, *see id*. Thus, it was logical for us to conclude that the defendant "could have sought the documents through discovery." *Id.* (quoting *Raley*, 470 F.3d at 804). But Laura's statement is different than the evidence withheld in *Raley*, *Rhoades*, and *Cunningham* because the defense did not know that the statement existed. At most, the defense knew that Patti and her sister were feuding; it had no reason to know that the sisters' feud was fueled by Patti's reputation as a liar. Based on the limited evidence available to the defense about Patti's relationship with Laura, it was not reasonable to expect that the defense would have requested to depose Laura or would even have prioritized speaking with her without knowing about the statements that Laura made to Detective Winn.

This case is also unlike *Turner v. United States*, where the Supreme Court last year concluded that the withheld evidence was not *Brady* evidence because it was "too little, too weak, or too distant from the main evidentiary points." 137 S. Ct. at 1894. *Turner* involved the brutal rape and murder of Catherine Fuller, in what the government believed had been a group attack. *Id.* at 1889. The withheld evidence in *Turner* was a witness's statement that he had seen two men, James McMillan and Gerald Merkerson, run into the alley where Fuller was murdered and stop near the garage where she had allegedly been raped. *Id.* at 1891. Turner's habeas counsel argued that this statement was material because after Fuller's murder, McMillan assaulted and raped two other women of comparable age in the same neighborhood, and the suppressed statement suggested that McMillan was returning to the scene of the crime to cover

his tracks. *Id.* at 1897 (Kagan, J., dissenting).  The Court found the argument unpersuasive, relying on the testimony of seven other government witnesses who affirmed that Fuller had been killed in a group attack, and reasoning that, given the strength of the evidence presented to the jury, the withheld evidence was not sufficient to undermine confidence in the verdict. *Id.* at 1894.

Because the evidence supporting Mellen's conviction was far less extensive than the seven witnesses that the government presented in *Turner*, this case is closer to *Kyles* and *Carriger*, than it is to *Turner*.  There is no dispute here that Patti was the prosecution's star witness and the only witness that linked Mellen to Richard Daly's murder.  The LAPD and Los Angeles District Attorney concurred in Mellen's habeas petition, and Mellen has been exonerated of any involvement in the crime.  *Kyles* considered a similar fact pattern, where the court recognized that "'the essence of the State's case' was the testimony of eyewitnesses," two in particular whose credibility could have been "substantially reduced or destroyed" by the withheld evidence.  514 U.S. at 441.  The facts were even more dramatic in *Carriger*, where the sole witness to testify to Carriger's confession was a known habitual liar who himself later confessed to committing the murder for which Carriger was charged. 132 F.3d at 466–68.  We are therefore convinced that it is *Kyles* and *Carriger*, not *Turner*, that dictate the outcome here.

In sum, had the jury learned that Laura Patti—the star witness's own sister and a law-enforcement officer—believed that June Patti was "the biggest liar" she had ever met, it would have put the government's critical witness in a new light.  Had this evidence been turned over to the defense or pursued by either side, the case may never have even gone

to the jury.   Given that the prosecution was so heavily dependent on June Patti's testimony, we conclude that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."   *Kyles*, 514 U.S. at 433 (citations omitted).   Laura's statements, if made, were undoubtedly material to Mellen's conviction for murder.

## 2. Deliberate Indifference

We are also convinced that the evidence that Mellen presented at summary judgment raised a genuine dispute of material fact as to whether Detective Winn acted with deliberate indifference to or reckless disregard for Mellen's rights and to the truth by withholding Laura's statement from prosecutors.   *See Tennison*, 570 F.3d at 1089; *see also Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (quoting *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013), for the deliberate indifference standard).   Whether a defendant acted with deliberate indifference or reckless disregard "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."   *Lemire v. Cal. Dep't of Corrs. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013) (citation omitted).   Summary judgment should not have been granted unless the district court concluded that "no reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a favorable verdict."   *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014) (citation and internal quotation marks omitted).

The undisputed evidence demonstrates that Detective Winn knew that Patti's testimony was critical to Mellen's prosecution.   Patti was the only witness to incriminate Mellen in the murder.   And, as the lead detective who had taken Patti's initial oral and written statements, Detective

Winn was aware of the subject of Patti's statements, where Patti claimed to be the only witness to Mellen's confession. As the lead investigator, Detective Winn also was present during trial, where Patti's credibility was a central issue; Patti's many prior inconsistent statements even forced the prosecution to put Detective Winn on the stand to clarify the testimony. So, Detective Winn no doubt knew that Patti's credibility was of utmost importance.

That the withheld statements came from a particularly credible source makes Detective Winn's failure to disclose them to the prosecutor all the more culpable. Laura Patti was not only an immediate relative who had grown up with June Patti, she was also a law-enforcement officer, aligned with the values of trustworthiness and dependability typically associated with that profession. Because of this, Laura's statements should have carried even more weight with Detective Winn. From the defense's perspective then, a juror could reasonably find that Detective Winn was reckless in withholding a *fellow law-enforcement officer's* opinion, even if that same juror would conclude that withholding a *layperson's* opinion was no more than negligent.

Although Detective Winn now disputes that she spoke with Laura Patti before trial, whether this conversation took place should have been a factual question for the jury to resolve at the § 1983 trial; it is not a question that the district court could resolve at summary judgment. If Laura's statements are to be believed, as they must at summary judgment, then Detective Winn called Laura to investigate Patti's credibility before trial. Laura stated in her deposition that Detective Winn did not inquire further when Laura told Detective Winn that Patti was a habitual liar, and it is undisputed that Detective Winn never communicated Laura's statements to the district attorney. A reasonable

juror could conclude from these facts that Detective Winn investigated Patti's credibility and communicated only evidence that favored the government, while willingly suppressing unfavorable evidence. In fact, Detective Winn's decision not to inquire further into Laura's claims is the hallmark of a "deliberate action[] to avoid confirming suspicions"—an action tantamount to knowledge under the law. *See United States v. Heredia*, 483 F.3d 913, 917 (9th Cir. 2007) (en banc); *see also United States v. Jewell*, 532 F.2d 697, 699–700 (9th Cir. 1976) (en banc). These facts alone, if proven at trial, would have established the mental state necessary to prove a violation of Mellen's due process rights.

But, there is more.  At the time of the investigation, Detective Winn was an experienced detective, who had participated in a hundred homicide investigations, and who had the training and experience to know the value of Laura's statements.  Detective Winn testified in deposition that she knew she had an obligation "to report and summarize what each witness said," and she claimed, based on this obligation, that if "Laura Patti or anybody told me that June Patti was not credible or she was a liar, I would have communicated that to the district attorney's office."  And Detective Winn's own assessment was supported at summary judgment by Mellen's police practices expert, Roger Clark, who explained that, "[a]ny reasonably trained officer or detective would have vetted the credibility of the key witness in this case."   Because Detective Winn acknowledges that she was obligated to disclose Laura's statements, if made, and Clark's report would have demonstrated that any reasonable police officer would have done the same, a reasonable jury could conclude that Detective Winn knowingly suppressed the statements to secure a conviction.

Other evidence suggests that Detective Winn bolstered Patti's credibility in the early stages of the investigation. The discrepancies between Patti's oral statement and the written statement prepared by Detective Winn suggest that Detective Winn modified Patti's written statement to conform to the physical evidence the police had found and to feed Patti information that Patti did not originally offer to investigators. For example, the written statement added that Daly's body had been set on fire in San Pedro, a fact that the coroner's report had suggested but that Patti had not mentioned in her initial oral statement. The written statement also added details about when and where the perpetrators left Daly's body in San Pedro that did not appear in Patti's oral statement. And, remarkably, even June Patti questioned the credibility of her own written statement when she testified at the preliminary hearing that Detective Winn had forced her to alter the statement to implicate a fourth person. But no one followed up to investigate these claims.[11] Detective Winn should have known how important these details were, particularly when she had also collected information from various other sources that indicated three other men had committed the crime.

And still other evidence suggests that Detective Winn would have taken any means necessary to secure Mellen's conviction. Mellen's evidence suggests that Detective Winn knowingly exceeded the scope of a search warrant for Kimball's car; suppressed the content of her conversation with another detective, Doral Riggs; spoke with a suspect without counsel present; and failed to investigate other

---

[11] We also question whether LAPD practices at the time, which allowed detectives to file the written statement in the murder book but to file the tape recording of the oral statement elsewhere, facilitated these discrepancies.

credible witness accounts of Daly's murder.  And Detective Winn's willingness to ignore Mellen's requests for counsel during her initial interrogation is indicative of the aggressive police tactics which Detective Winn used to investigate this case.

That Laura believed that Detective Winn was justified to proceed with Patti as a witness is beside the point.  It is for a jury to determine whether a reasonable officer in Detective Winn's position acted with deliberate indifference to Mellen's due process rights, taking into account the seriousness of the charges levied against Mellen, what was known to Detective Winn at the time, and evidence about what a reasonable police officer would do in the same position.

We conclude that this evidence raised a genuine dispute of material fact that Detective Winn acted with deliberate indifference or reckless disregard of Mellen's due process rights when she failed to disclose Laura's statements about her sister's reputation for honesty to the prosecutor.

### B.  Clearly Established Law

We next must decide whether it was clearly established, in 1997, that police officers had a duty to disclose material impeachment evidence to prosecutors.  This is not an open question in our Circuit.

In *Carrillo v. County of Los Angeles*, we concluded that "[t]he law in 1984 clearly established that police officers were bound to disclose material, exculpatory evidence." 798 F.3d 1210, 1219 (9th Cir. 2015).  *Carrillo* cited approvingly *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978) (per curiam), an even earlier case that concluded that police investigators violate *Brady* when they fail to disclose

material impeachment evidence to prosecutors.  *Carrillo*, 798 F.3d at 1220 (citing *Butler*, 567 F.2d at 891); *see also id.* at 1222 ("[T]he vast majority of circuits to have considered the question have adopted the view that police officers were bound by *Brady*.").  In *Butler*, we observed that "[s]ince the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure."  567 F.2d at 891. There, the impeachment evidence was the officers' assurances to the witness that he would be treated favorably by the judge if he testified successfully in the criminal trial— evidence that could have been used to undermine the credibility of the witness's testimony.  *Carrillo* also relied on *Kyles*, the case where the Supreme Court expressly extended *Brady* obligations to police officers.  *Carrillo*, 798 F.3d at 1221 (quoting *Kyles*, 514 U.S. at 438).  *Kyles*, decided in 1995, involved police officers' suppression of prior inconsistent statements that defense counsel could have used to impeach key eyewitnesses in a homicide trial. 514 U.S. at 441–54.  We noted in *Carrillo* that "*Kyles* itself *rejected* the state's argument that 'it should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor.'" 798 F.3d at 1221 (quoting *Kyles*, 514 U.S. at 438).

Detective Winn offers no meaningful way to distinguish *Carrillo*, *Butler*, and *Kyles*, and we agree that these cases are controlling.  We therefore reverse the district court's grant of summary judgment for Detective Winn on Mellen's § 1983 claim premised on a violation of her due process rights, and we remand for further proceedings.

## C.  Familial Association Claims

The district court also granted summary judgment on Mellen's children's claims, which were dependent on

Mellen's due process claim.  Because Mellen's children's associational claims rise and fall with Mellen's due process claim, we must also reverse the grant of summary judgment on these claims and remand for further proceedings.  *See Crowe v. Cty. of San Diego*, 608 F.3d 406, 441–42 (9th Cir. 2010) (concluding that unlawful incarceration due to police misconduct qualifies as "[u]nwarranted state interference with the relationship between parent and child" and violates substantive due process (internal quotation marks and citations omitted)).

### D.  Police Expert Opinion

The district court abused its discretion in striking the declaration of police practices expert, Roger Clark.  *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014) (en banc) (standard of review).  The district court mistakenly concluded that a police practices expert cannot assist the jury in making the legal determination about whether an officer's conduct was "reasonable."  But Mellen did not offer Clark's expert declaration for a legal conclusion that Detective Winn's conduct was unreasonable; rather, she offered the report as circumstantial evidence of Detective Winn's state of mind and to show that Detective Winn's failure to disclose Laura's statement deviated far from the norm of what would be expected of a reasonable police officer in Detective Winn's position.  The report should have been admitted to assist the trier of fact in determining whether Detective Winn's conduct deviated so far from institutional norms that the jury could conclude that Detective Winn was reckless or deliberately indifferent to Mellen's constitutional rights.  *See United States v. Christian*, 749 F.3d 806, 811 (9th Cir. 2014); *see also Jimenez v. City of Chicago*, 732 F.3d 710, 721–22 (7th Cir. 2013) (admitting police practices expert testimony in a

§ 1983 civil suit as circumstantial evidence of reckless misconduct).

## III.

Susan Mellen was convicted for murder based solely on the testimony of June Patti. Mellen's evidence at summary judgment raises a genuine dispute of material fact as to whether Detective Winn knew that June Patti was a liar, and failed to disclose material, exculpatory, evidence of that fact. Summary judgment should not have been granted on this record. Mellen should have the opportunity to prove, after nearly two decades, whether wrongful conduct played a role in her conviction, and whether she deserves compensation for her wrongful imprisonment.

**REVERSED** and **REMANDED**.